The STATE of Ohio, Appellee,

v.

KRIVITSKIY, Appellant.

[Cite as *State v. Krivitskiy* (1990), 70 Ohio App.3d 293.]

Court of Appeals of Ohio,
Franklin County.

No. 90AP–196.

Decided Nov. 13, 1990.

S. Michael Miller, Prosecuting Attorney, *Alan C. Travis, Bonnie L. Maxton* and *Joyce Anderson,* for appellee.

*Vivyan, Graeff & Schumacher* and *David J. Graeff,* for appellant.

STRAUSBAUGH, Judge.

This is an appeal by defendant from a judgment of the Franklin County Court of Common Pleas which convicted defendant on twenty-eight counts of trafficking in drugs, one count of Medicaid fraud, and one count of theft. Following a jury trial, the trial court sentenced defendant to a total of six and one-half to fifteen years in prison with two years' actual incarceration.

Defendant, Leonid Krivitskiy, was jointly tried with his ex-wife and receptionist, Lilia Deutsch, for theft, Medicaid fraud, and aggravated drug trafficking. The state presented testimony from fifteen undercover Columbus police detectives, state Medicaid fraud agents, and agents from the Attorney General's office of criminal identification and investigation, who described their nine-month "sting operation" which occurred at defendant's medical practice on East Broad Street in Bexley, Ohio. Narcotics agents originally received complaints about defendant from pharmacies as early as 1983. In June 1987, agents Jenny Rarick and David Roberson, while making undercover buys in Zanesville as part of a separate investigation, were introduced into defendant's office as patients seeking prescriptions of the addictive Schedule IV drug, diazepam, which is a form of Valium. In October 1987, Rarick and Roberson returned to defendant's office wearing body wires and again received prescriptions from defendant in exchange for cash without receiving any medical services.

Subsequently, an extensive investigation of defendant's medical practice took place from March 7, 1988 through November 29, 1988, which culminated in the execution of a search warrant at defendant's office on December 21, 1989. The agents' testimony indicated that Deutsch made en masse appointments for groups of agents ranging in size from four to eleven. Using aliases, some agents posed as welfare recipients with Medicaid cards while others posed as cash-paying patients. On each agent's initial visit, Deutsch asked the agent to fill out personal information on a medical history form. Defendant then quickly reviewed the past medical history part of the form and, after a very brief examination, would prescribe either diazepam or its more expensive counterpart, Xanax. The agents testified that their initial office visits with defendant lasted between three to six minutes, excluding time spent in the waiting room, and that subsequent visits lasted one to four minutes. Agents posing as patients saw defendant a total of one hundred four times during the investigation, during which they were in defendant's examination room a total of two hundred sixty-seven minutes, or an average of two minutes thirty-six seconds per patient, per visit.

Agents who posed as welfare recipients were required to submit their Medicaid cards to Deutsch before being admitted to the examination room.

When Medicaid was billed for the agents' visits, there were only three different Medicaid codes used, which netted defendant fees ranging from $18 to $28, per visit. In contrast, agents who posed as cash-paying patients were required to pay $25 up front before receiving their prescriptions and were scheduled for appointments less frequently than those who were receiving treatment under Medicaid. There was also testimony that defendant billed Medicaid for office visits which never occurred. In fact, of a total of one hundred four scheduled visits, agents were physically present only seventy-one times, yet defendant prescribed for them in their absence.

Following an examination of defendant's Medicaid billings, it was apparent that defendant utilized only three specific Medicaid codes: 90080, 90060, and 90020. The state presented an expert, Dr. Trent Sickles, who described the codes for which defendant billed Medicaid. A visit coded for 90080 payment is a comprehensive examination for an established patient, which should take the average physician a minimum of one hour to perform. The code 90020 designates a comprehensive examination for a new patient, which includes filling out a past medical history form such as the one defendant used and would normally take one hour to complete. A 90060 code would also entail a one-hour visit with a patient. Dr. Sickles testified that defendant's medical records and documentation did not justify defendant's billing Medicaid using any of the three codes which defendant routinely used. Dr. Sickles said it would be impossible to diagnose an insomnia or anxiety disorder on the basis of a two-minute office visit, and that while diazepam or Xanax is appropriate to prescribe for such symptoms, they are very addictive drugs and it is not standard medical practice to prescribe refills for these drugs every two weeks for months at a time as defendant did.

Deutsch testified that she did the Medicaid billings for defendant's practice and claimed that for eight years she billed using only three Medicaid codes because she was unable to understand the billing code book. To decide which Medicaid billing codes to use, Deutsch said she either looked inside the patient's folder or asked defendant. She stated on direct examination that the most patients defendant ever saw in one day was seven, but on cross-examination, she admitted that defendant routinely saw many more than that, as many as thirty-five patients in one day. Deutsch also admitted that cash customers' prescriptions were routinely for sixty diazepam or Xanax pills, while Medicaid customers received only thirty pills and were rescheduled for another office visit in sixteen days, per defendant's instructions. The net result was that the average cash-paying patient paid $25 per month to see defendant and received a prescription of twice as many pills as did the average Medicaid patient, whose welfare card was charged approximately $56 per month.

On appeal, defendant sets forth two assignments of error for this court's review:

"1. Where the chief detective in charge of an investigation of an accused admits in his direct testimony that an integral part of said investigation was to entrap the accused, said entrapment defense is established as a matter of law, and the verdict of the jury cannot stand.

"2. Where the errors of law are so numerous during the course of a jury trial, an accused is denied his right to a fair trial consistent with the Sixth and Fourteenth Amendments to the United States Constitution."

▆ Defendant argues in his first assignment of error that his conviction cannot stand on the basis of entrapment. Defendant insists that the evidence in the present case demonstrates that the police decided to entrap defendant and that the chief supervisor of the operation, along with fellow agents, acted to entrap defendant into selling improper prescriptions.

In *State v. Doran* (1983), 5 Ohio St.3d 187, 5 OBR 404, 449 N.E.2d 1295, the Supreme Court adopted the subjective definition for the defense of entrapment so as to focus upon the predisposition of the accused to commit an offense as opposed to an objective test which would focus upon the degree of inducement used by the police so as to determine whether such actions would induce an ordinary law-abiding citizen to commit an offense. The Supreme Court held in paragraph one of the syllabus:

"The defense of entrapment is established where the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order to prosecute."

The court continued in the body of its opinion, stating:

" * * * By focusing on the predisposition of the accused to commit an offense, the subjective test properly emphasizes the accused's criminal culpability and not the culpability of the police officer. * * * " *Id.*, 5 Ohio St.3d at 192, 5 OBR at 408, 449 N.E.2d at 1299.

The court then set forth certain factors which would be relevant in determining whether an accused was predisposed to commit the criminal activity with which he was charged. These factors included:

" * * * (1) [T]he accused's previous involvement in criminal activity of the nature charged, (2) the accused's ready acquiescence to the inducements offered by the police, (3) the accused's expert knowledge in the area of the criminal activity charged, (4) the accused's ready access to contraband, and (5) the accused's willingness to involve himself in criminal activity. * * * " *Id.* at 192, 5 OBR at 408–409, 449 N.E.2d at 1299.

In the present case, we find that the record is replete with evidence demonstrating defendant's subjective predisposition to commit the crimes with which he was charged. We note at the outset that the state's expert, Dr. Sickles, testified that defendant's prescription practices fell well below standard medical practices. Furthermore, based upon complaints made over several years and upon the undercover agents' introduction into defendant's office as patients in 1987, there exists evidence demonstrating that defendant was previously involved in criminal activity of the same nature for which he was ultimately convicted. Defendant also readily acquiesced to the police inducement of their appearing at his office as patients. Clearly, defendant had expert knowledge in the area of prescribing drugs in exchange for cash, and he was already established as a ready source who dispensed drugs before the police became involved. Defendant's medical license gave him ready access to the drugs which he dispensed. Finally, his willingness to involve himself in criminal activity was demonstrated by his interactions with police agents more than one hundred times. Based upon the aforementioned facts, we find that defendant was predisposed to commit the offenses with which he was charged, and that the state merely provided defendant the opportunity to prescribe drugs for illicit purposes. See *McCutcheon v. Ohio State Medical Bd.* (1989), 65 Ohio App.3d 49, 582 N.E.2d 1030. Accordingly, defendant's first assignment of error is not well taken and is overruled.

In his second assignment of error, defendant argues that he was deprived of his right to a fair trial on the basis of errors which he claims are too numerous to mention which allegedly occurred throughout the trial and in turn affected the jurors' impartial determinations.

In *Foster v. Bd. of Elections* (1977), 53 Ohio App.2d 213, 7 O.O.3d 282, 373 N.E.2d 1274, the court held, in pertinent part, in paragraph six of the syllabus:

"Appellate Rule 12(A) provides that any errors not separately argued by brief may be disregarded. Appellate Rule 16(A)(4) requires that the brief contain an argument and that the argument include the contentions of the appellant and the reasons for his conclusion with citations to the appropriate authorities and to the parts of the record relied on. * * *"

In the present case, the sole example upon which defendant relies to demonstrate the trial court's alleged partiality was held outside the presence of the jury. Furthermore, defendant received a favorable ruling on this portion of his argument from the trial court, lending credence to the state's argument that defendant's contentions are without merit. While this court is not required to search the record for potential error since defendant failed to comply with App.R. 12(A), nevertheless, upon review of the record, we do not find errors to exist which would support defendant's argument. Accordingly,

defendant's second assignment of error is not well taken and is therefore overruled.

Based upon the foregoing, defendant's assignments of error are not well taken and are overruled. The judgment of the trial court is hereby affirmed.

*Judgment affirmed.*

REILLY, P.J., and JOHN C. YOUNG, J., concur.